**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **PSEG RENEWABLE TRANSMISSION LLC** | |
| *Petitioner,* | |
| v. | **Case No.** 1:25-cv-02296-ABA |
| **ALVI PROPERTIES, LLC** *et al.* | |
| *Respondents.* | |

---

**RESPONDENTS' MEMORANDUM IN SUPPORT OF
<u>OPPOSITION TO PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION</u>**

Respectfully submitted,

<u>*/s/ Harris W. Eisenstein*</u>
Harris W. Eisenstein (Fed. Bar No. 29694)
David M. Wyand (Fed. Bar No. 23413)
Lauren M. McLarney (Fed. Bar No. 20982)
Rosenberg Martin Greenberg, LLP
25 S. Charles Street 21st Floor
Baltimore, Maryland 21201
Phone: (410) 727-6600
Fax: (410) 727-1115
heisenstein@rosenbergmartin.com
dwyand@rosenbergmartin.com
lmclarney@rosenbergmartin.com

*Attorneys for Respondents*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................2

    I.    The Regulatory Scheme ...................................................................................2

    II.   The MPRP ........................................................................................................3

    III.  The PSC Proceeding ........................................................................................5

    IV.  The Prior District Court Proceeding on Appeal ...........................................6

LEGAL STANDARD .........................................................................................................7

ARGUMENT .......................................................................................................................7

    I.    The Court should preserve the status quo by denying the Preliminary Injunction .....7

    II.   PSEG is not likely to succeed on the merits ................................................8

    III.  PSEG has not shown it will suffer irreparable harm absent injunctive relief ...........9

        A. *Mountain Valley* and *Sage* do not support injunctive relief on these facts ..........9

        B. PSEG's stated harm is not irreparable ................................................11

    IV.  The balance of equities does not warrant an injunction...........................23

    V.   The public interest decisively favors denying the requested injunction .................28

CONCLUSION...................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 289 F. Supp. 3d 73
(D.D.C. 2018) ................................................................................................21

*2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, No. 24-2245, 2025 WL
1584984 (4th Cir. June 5, 2025) ...................................................................8

*Ark. Game & Fish Comm'n v. U.S.*, 568 U.S. 23 (2012) ...............................................25

*Blue Water Baltimore, Inc. v. Mayor & City Council of Baltimore*, 635 F. Supp. 3d 392
(D. Md. 2022) ................................................................................................15

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) ........................................25, 28

*Coastland Corp. v. Third Nat. Mortg. Co.*, 611 F.2d 969 (4th Cir. 1979)....................18

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802 (4th Cir. 1991) ..........13, 15, 22, 23

*E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004) ...............................9, 10, 18, 28

*Fairy-Mart v. Marathon Petroleum Co., LP*, No. 3:17-CV-1195 (MPS), 2017 WL 5140514
(D. Conn. Nov. 6, 2017) ...............................................................................22

*Guar. Corp., No. 09-1675 (JR)*, 2010 WL 3168048 (D.D.C. Apr. 16, 2010) ..............20

*Hazardous Waste Treatment Council v. State of S.C.*, 945 F.2d 781 (4th Cir. 1991) ..................8

*Heritage Found. v. U.S. Dept. of State*, No. CV 24-2862 (TJK), 2024 WL 4607501
(D.D.C. Oct. 29, 2024) .................................................................................19, 20

*Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691
(4th Cir. 1994)...............................................................................................16

*In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517 (4th Cir. 2003) *abrogated on other grounds
by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ...........................17, 18

*J.L. Matthews, Inc. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 368 Md. 71
(2002)...........................................................................................................26

*J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33 (D. Md. 2020) ..........................7

*LaFontaine's Heirs at L. & Next of Kin v. LaFontaine's Heirs at L. & Next of Kin*, 205 Md. 311
(1954) ...........................................................................................................27, 28

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ..............1, 2, 8

*Litz v. Maryland Dept. of Env't*, 446 Md. 254 (2016) ....................................................................27

*Mackie v. Mayor & Com'rs of Town of Elkton*, 265 Md. 410 (1972) ......................................13, 27

*Metso Mins., Inc. v. Powerscreen Int'l Distribution Ltd.*, 788 F. Supp. 2d 71 (E.D.N.Y. 2011) ..20

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
    915 F.3d 197 (4th Cir. 2019) ........................................................................................ *passim*

*N. Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469 (7th Cir. 1998) ............................11

*Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922) ...............................................................................27

*Permanence Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904
    (D.D.C. June 10, 2024) ..............................................................................................................20

*Pers. v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476 (D. Md. 2006) ......................16

*Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194 (4th Cir. 2024) ....................................1

*Planned Parenthood S. Atl. v. Baker*, 326 F. Supp. 3d 39 (D.S.C. 2018),
    *aff'd*, 941 F.3d 687 (4th Cir. 2019) .....................................................................................20, 21

*PSEG Renewable Transmission LLC v. Arentz Family, LP*, No. 25-CV-1235-ABA,
    2025 WL 1725814 (D. Md. June 20, 2025) ................................................................. *passim*

*Reichs Ford Rd. Joint Venture v. State Roads Comm'n of the State Highway Admin.*,
    388 Md. 500 (2005) ....................................................................................................................26

*SH Franchising, LLC v. Newlands Homecare, LLC*, No. CV CCB-18-2104, 2019 WL 356658
    (D. Md. Jan. 29, 2019) ...............................................................................................................15

*Sokel v. Nickoli*, 97 N.W.2d 1 (Mich. 1959) ................................................................................26

*State Roads Comm'n v. Jones*, 241 Md. 246 (1966) .....................................................................27

*Steuart v. City of Baltimore*, 7 Md. 500 (1855) ...........................................................................27

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) ...........25

*US Airline Pilots Ass'n v. Pension Benefit Guar. Corp.*, No. CV 09-1675 (HHK),
    2011 WL 13273132 (D.D.C. Mar. 14, 2011) .............................................................19, 20, 21

*West Ohio Gas Co. v. Pub. Utilities Comm'n of Ohio*, 294 U.S. 63 (1935) ................................19

*Wetzel v. Edwards*, 635 F.2d 283 (4th Cir. 1980) ........................................................................8

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .............................. *passim*

**Statutes & Regulations**

15 U.S.C. § 717f(h) ...........................................................................................................................3

16 U.S.C. § 824(a) ............................................................................................................................2

16 U.S.C. § 824(b)(1) .......................................................................................................................3

16 U.S.C. § 824s ...............................................................................................................................3

COMAR 20.79.01.07 ......................................................................................................................12

Md. Code Ann., Nat. Res. § 3-306(b)(2) ......................................................................................12

Md. Code, Pub. Util. § 3-101 *et seq.* ..............................................................................................6

Md. Code, Pub. Util. § 7-101 *et seq.* ..............................................................................................6

Md. Code, Pub. Util. § 7-207 .............................................................................................. *passim*

Md. Code, Real Prop. § 12-105 ....................................................................................................26

Md. Code, Real Prop. § 12-111 ..................................................................................................2, 8

Md. Const. Art. III, § 40 .........................................................................................................25, 26

U.S. Const. Amend. V, cl. 4 ....................................................................................................25, 26

**Other Authorities**

*Facts & Figures*, PSEG, https://corporate.pseg.com/aboutpseg/companyinformation/
    factsandfigures (last visited Aug. 5, 2025) ............................................................................23

FERC Order 1000, 136 FERC P 61051, 2011 WL 2956837 (2011) .............................2, 5, 18, 22

*In re Application of PSEG Renewable Transmission LLC*, Case No. 9773
    (Md. Pub. Serv. Comm'n 2024) .....................................................................................6, 14, 15

Marin Scotten, *More transmission line conflicts expected as US electricity demand booms*,
    (Apr. 15, 2025, 6:00 AM) ........................................................................................................3

*Potomac-Appalachian Transmission Highline, LLC & PJM Interconnection, L.L.C.*,
    152 FERC ¶ 63,025, 66,165 (2015) ........................................................................19

*PPL Electric Utilities Corp.*, 188 FERC ¶ 61,084 (2024) ...............................................3

*PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for
    Transmission Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024) .........................4, 14

*Re New England Power Co.*, 31 FERC ¶ 61,047, 61,082 (1985) ..................................19

# INTRODUCTION

Petitioner PSEG Renewable Transmission LLC ("Petitioner" or "PSEG") is a private company from New Jersey. It does not have final authority to construct the ambitious, 67-mile transmission line across Maryland known as the Maryland Piedmont Reliability Project ("MPRP"). Nor does it have authority to acquire associated property rights by eminent domain. Those foundational issues are pending before the Maryland Public Service Commission ("PSC"), which will rule in due course and after careful consideration of PSEG's application for a Certificate of Public Convenience and Necessity ("CPCN").

Rather than working through the PSC process to obtain the power of eminent domain, PSEG asks the judiciary to usurp the PSC's role and determine that PSEG already has eminent domain authority. Through its Complaint and contemporaneous Motion for Preliminary Injunction, PSEG does not ask the Court "to maintain the status quo until after a trial and final judgment, which is the traditional function of a preliminary injunction." *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). PSEG seeks "an order altering the status quo before the case even begins," known as a mandatory injunction. *Id.* This "particularly aggressive form of preliminary injunction" is "disfavored" in "any circumstance." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014) (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994)).

Specifically, PSEG seeks authority to "enter" and "remain on" every inch of private property owned by the 201 Respondents[1] to conduct "surveys" and gather "information" from now until whenever PSEG's CPCN Application "is granted or denied," ECF 124-8 at 1, which means years. PSEG presents no logistical controls or temporal limitations to such access. The only

---

[1] For ease of reference, the term "Respondents" refers to the 102 landowners represented by undersigned counsel as well as the other landowners sued in this action.

proposed condition is that PSEG provide "not less than 24 hours' notice" to any affected Respondent by "taping a notice" on the Respondent's front door. *Id.* at 2. And PSEG offers no compensation for this imposition, even though its entrance onto private property is for the express purpose of "acquisition and future use of the properties in connection with the" MPRP. *Id.* at 1-2.

The law does not countenance the relief PSEG seeks. As set forth in Respondents' Motion to Dismiss ("MTD"), filed concurrently and incorporated herein, PSEG will not succeed on the merits because it is not entitled to relief under Section 12-111 of the Real Property Article ("RP § 12-111"). Nor has PSEG shown it will suffer any harm, irreparable or otherwise. And when PSEG's alleged harm is balanced against the harm to all Respondents—asked to sacrifice their private property now despite PSEG having no condemnation authority and paying nothing for the right of entry—equity and the public interest both counsel against a preliminary injunction.

In summary, PSEG's request is untethered from basic principles of law and equity. It also falls well short of the requirements for injunctive relief. Accordingly, and for the reasons that follow, the Court should deny PSEG's Motion for Preliminary Injunction.

## STATEMENT OF FACTS[2]

### I.    The Regulatory Scheme

The construction and siting of high-voltage electric transmission lines in the United States are subject to federal planning requirements but remain under the primary authority of the States. *See* 16 U.S.C. § 824(a) (Federal Energy Regulatory Commission ("FERC") regulation "to extend only to those matters which are not subject to regulation by the States"); FERC Order 1000, 136 FERC P 61051, 2011 WL 2956837 (2011) at ¶ 107 ("We acknowledge that there is longstanding

---

[2] This action was filed on July 15, 2025, just 21 days prior to Respondents filing the instant Opposition. Respondents have not had a full opportunity to develop the factual record. They reserve the right to do so.

state authority over certain matters that are relevant to transmission planning and expansion, such as matters relevant to siting, permitting, and construction.").

FERC oversees planning and cost allocation through regional transmission organizations, including PJM Interconnection, L.L.C. ("PJM"), and authorizes financial incentives to encourage investment. *See* 16 U.S.C. § 824s (directing FERC to establish incentive-based rate treatments for transmission investments). PJM, for its part, identifies system needs and recommends projects for development within its regulated territory. *See PPL Electric Utilities Corp.*, 188 FERC ¶ 61,084, at P 14 (2024). However, PJM's recommendations do not authorize construction nor confer rights to access or acquire land.

Unlike the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(h), the Federal Power Act ("FPA") preserves state jurisdiction over transmission siting and construction. *See* 16 U.S.C. § 824(b)(1). To construct a high-voltage overhead transmission line in Maryland, one must first obtain a CPCN from the PSC. Md. Code, Pub. Util. ("PU") § 7-207(b)(3)(i). Without a CPCN, "a person may not begin construction… or exercise a right of condemnation with the construction." *Id.*

## II.    The MPRP

The MPRP is a proposed 67-mile, 500 kilovolt aboveground power line project running through Baltimore, Carroll, and Frederick counties. It is, in effect, a long "extension cord" from the Pennsylvania line through Maryland to serve the power needs of existing or future data centers in Northern Virginia. Marin Scotten, *More transmission line conflicts expected as US electricity demand booms*, (Apr. 15, 2025, 6:00 AM).[3] The proposed route cuts through multi-generational family farms and homesteads, conserved and preserved land, and property supporting myriad small businesses. *See infra* at Arg. § IV.

---

[3] Available at: https://www.thebaltimorebanner.com/community/climate-environment/transmission-line-conflicts-FNBOTSALRNCK7LZYTLKQWIW3VE/ (last visited Aug. 5, 2025).

On April 11, 2024, PJM and PSEG entered into a Designated Entity Agreement ("DEA") concerning the development and construction of the MPRP. *See* ECF 3-1 (copy of DEA). The DEA sets a tight development schedule, including establishing June 1, 2027 as the milestone, or deadline, for completing the MPRP. ECF 3-1 at 20. If construction of the MPRP is delayed, the DEA mandates that PJM "shall conduct a re-evaluation pursuant to Section 1.5.8(k) of Schedule 6 of the Operating Agreement"[4] and determine whether to retain the MPRP. *Id.* at 8 (§ 7.4). "If based on such re-evaluation, the [MPRP] is retained in the Regional Transmission Expansion Plan and [PSEG's] designation for the [MPRP] also is retained, the Parties shall modify this Agreement, including Schedules, as necessary." *Id.*

On April 15, 2024, PSEG filed a petition for a declaratory order authorizing its use of certain transmission rate incentives under the FPA to mitigate the risks associated with developing the MPRP. *See PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for Transmission Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024).[5] In its Petition, PSEG described the MPRP as "a major, linear transmission project that faces significant risks and challenges." *Id.* at 2. Among other things, PSEG "faces significant siting, permitting, environmental, and construction risks and challenges because the Project is subject to a host of federal and state regulatory approvals and permits, including the need to obtain a CPCN from the PSC, "which is expected to be a comprehensive and potentially lengthy process." *Id.* at 3. PSEG also noted that the MPRP "is a greenfield project for most of the project route, which poses uncertainty and risk." *Id.* at 31 (Prepared Testimony of Jason Kalwa at 9). Further, the target "in-service date of June 1, 2027" means "an aggressive timeline to execute and complete all

---

[4] Available at: https://www.pjm.com/pjmfiles/directory/merged-tariffs/oa.pdf (last visited Aug. 5, 2025).
[5] Available at: https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20240415-5328 (last visited Aug. 5, 2025).

construction activities." *Id*. PSEG must also "manage ROW permitting and land acquisition risks associated with the greenfield line routes in a compressed period of time[,]" as it "will need to obtain ROWs, rights-of-entry, easements, and temporary access agreements, and in these efforts, may encounter local opposition from landowners." *Id.* "To mitigate these risks and challenges," PSEG sought three transmission incentives, including "the ability to recover 100% of all prudently incurred costs if the Project is abandoned for reasons outside of PSEG RT's control." *Id.* at 2.

On August 29, 2024, FERC granted the Petition and issued an Order Granting Petition for Declaratory Order ("FERC Order") (**Exhibit 1**). FERC found "that the Project faces risks, as discussed by PSEG RT, beyond PSEG RT's control that could lead to the Project's abandonment and that approval of the Abandoned Plant Incentive will address those risks." *Id.* at ¶ 16. That finding led FERC to conclude that PSEG can recover "100% of prudently incurred costs expended on or after the date of this Order, if the Project is abandoned for reasons beyond PSEG RT's control." *Id.* at ¶ 17. FERC further noted that "[i]n the event that PSEG RT seeks abandoned plant recovery for costs expended during the time period prior to the effective date of this order, they would be eligible to seek recovery of 50% of their prudently incurred costs, consistent with prior precedent." *Id*. at 14-15 n.32. Recognizing that "PSEG RT will expend significant capital during the planning, permitting, development, pre-construction, and construction phases of project development," FERC will also "allow PSEG RT to recover pre-commercial costs, as well as start-up and development costs, after the Project goes into service." *Id.* at ¶ 21. PSEG obtained the FERC Order *before* FERC approved the DEA, which occurred on September 10, 2024. ECF 3-3.

### III.    The PSC Proceeding

On December 31, 2024, PSEG filed its Application for a CPCN with the PSC. ECF 1 at ¶ 2. As of August 5, 2025, PSEG and other interested parties had made over 500 filings in the PSC

proceeding. *In re Application of PSEG Renewable Transmission LLC*, Case No. 9773 (Md. Pub. Serv. Comm'n 2024).[6] The CPCN process combines the procedural protections applicable to all PSC proceedings under PU § 3-101 *et seq.*, with additional substantive requirements for transmission projects under PU § 7-101 *et seq*. Title 3 ensures that PSC proceedings allow for public participation, intervention by interested persons, and the development of a full administrative record. Title 7 requires that an applicant submit a detailed CPCN application addressing project need, alternative routes, and environmental, land use, and reliability impacts.

Upon receipt of PSEG's CPCN Application, the PSC coordinated a multi-agency review, solicited public comments, and provided notice to affected property owners, local governments, and elected officials. PU § 7-207(c). Public hearings in each affected jurisdiction will follow. *Id.* at § 7-207(d). The PSC will "take final action" on PSEG's CPCN Application "only after due consideration" of, among other factors, the need for the MPRP, alternative routes, and the environmental and land use impacts. *Id.* at § 7-207(f)(1).

On July 15, 2025, with the PSC still weighing the CPCN Application, PSEG filed this action with a Motion for Preliminary Injunction. On July 28, 2025, 13 days later, the PSC's Office of Staff Counsel recommended a procedural schedule with a "target final order date" of March 26, 2027. *See* Office of Staff Counsel's July 28, 2025 Letter to the PSC (**Exhibit 2**), at 3-6. If the PSC adopts this schedule, it will not decide PSEG's CPCN Application until the spring of 2027.

## IV.    The Prior District Court Proceeding on Appeal

Three months before filing this action, PSEG sued 117 landowners in the case captioned *PSEG Renewable Transmission LLC v. Arentz Family, LP*, No. 25-CV-1235-ABA ("*Arentz*"). At PSEG's request, the district court expedited *Arentz* to a merits hearing on May 19, 2025. 2025 WL

---

[6] All PSC filings are available at: https://webpscxb.psc.state.md.us/DMS/case/9773 (last visited Aug. 5, 2025).

1725814, *10 (D. Md. June 20, 2025). The *Arentz* respondents' appeal for targeted discovery prior to consideration of PSEG's motion for preliminary injunction was denied, and the district court entered a preliminary injunction on June 20, 2025. *Id.* The *Arentz* respondents' appealed that decision on June 24, 2025, which appeal is pending.

PSEG could have joined the 201 Respondents to its earlier-filed litigation. It elected not to. All Respondents in this case are, of course, entitled to due process.

## LEGAL STANDARD

In determining whether to issue a preliminary injunction, a court must consider four factors: (1) whether the plaintiff "is likely to succeed on the merits," (2) whether the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief," (3) whether "the balance of equities tips in [plaintiff's] favor," and (4) whether "an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "All four requirements must be met in order for a preliminary injunction to be granted." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 58 (D. Md. 2020).

## ARGUMENT

PSEG cannot satisfy any of the factors for injunctive relief. In fact, this action is legally deficient. *See generally* Respondents' MTD. For those and other reasons that follow, PSEG's request for a preliminary injunction should be denied.

### I.    The Court should preserve the status quo by denying the Preliminary Injunction.

PSEG is not asking the Court to preserve the status quo. It is asking the Court to upend the status quo *before* Respondents can take any discovery, mount defenses with the benefit of a complete factual record, and present those defenses to the Court.

A preliminary injunction is "an extraordinary remedy" available only in extraordinary circumstances. *Winter*, 555 U.S. at 22. "The rationale behind a grant of a preliminary injunction has been explained as preserving the *status quo* so that a court can render a meaningful decision after a trial on the merits." *Hazardous Waste Treatment Council v. State of S.C.*, 945 F.2d 781, 788 (4th Cir. 1991) (emphasis in original). The typical form of preliminary injunction, known as a prohibitory injunction, aims to maintain the status quo. *League of Women Voters of N.C.*, 769 F.3d at 236 (defining the status quo as "the last uncontested status between the parties which preceded the controversy"). "Unlike prohibitory preliminary injunctions, mandatory preliminary injunctions alter, rather than preserve, the status quo, and therefore are disfavored, and warranted only in the most extraordinary circumstances." *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC,* No. 24-2245, 2025 WL 1584984, at *2 (4th Cir. June 5, 2025) (internal citations and quotations omitted); *see also Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980).

The "last uncontested status" preceding this lawsuit is not in dispute. No Respondent had consented to PSEG entering their private property. PSEG even cites this lack of consent as the basis for seeking a mandatory injunction to enter and survey Respondents' land. ECF 1 at ¶¶ 4, 432, 451, 452, 459. Because PSEG is asking the Court to do what is strongly disfavored—enter a mandatory injunction before this case even begins—its Motion should be denied.

**II.      PSEG is not likely to succeed on the merits.**

Respondents' MTD details the various reasons why PSEG is not likely to succeed on the merits. In the interest of brevity, Respondents incorporate those arguments here. In summary, PSEG cannot succeed on the merits because its sole claim for relief is not available to PSEG under RP § 12-111. Under the plain language of PU § 7-207, a private transmission line developer only has the power of eminent domain "[o]n issuance of a certificate of public convenience and

necessity." PU § 7-207(b)(3)(v). PSEG does not have a CPCN, is not an entity "having the power of eminent domain" and has no access rights granted by the statute.

**III.    PSEG has not shown it will suffer irreparable harm absent injunctive relief.**

A party seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis original). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). The mere "possibility" of harm is not enough. *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (internal citations omitted).

In an effort to clear this high bar, PSEG argues it will suffer irreparable injury absent immediate access to Respondents' properties. PSEG's supposed harm is: (1) without preliminary relief, PSEG might not meet the June 1, 2027 in-service date for the MPRP; (2) if construction of the MPRP is delayed, PSEG might incur financial losses; and (3) absent injunctive relief, PSEG cannot exercise a "statutory right" under RP § 12-111. This harm is not irreparable. It is exaggerated and illusory, unsupported by competent evidence, and the precedent on which PSEG relies undermines its cause.

**A. *Mountain Valley* and *Sage* do not support injunctive relief on these facts.**

PSEG places great emphasis on two Fourth Circuit cases, *Mountain Valley*, *supra*, and *E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004), but those cases presented vastly

different factual and procedural scenarios. In each case, a natural gas company, having already received a CPCN from FERC under the NGA, brought condemnation proceedings against landowners in the path of the pipeline project. Unlike this case, the landowners in *Mountain Valley* and *Sage* conceded that the gas companies had the right to take land by force of eminent domain. *Mountain Valley*, 915 F.3d at 216 ("There is no question, then, that Mountain Valley may take easements across the properties at issue, making this the rare preliminary-injunction case in which success on the merits is guaranteed."); *Sage*, 361 F.3d at 829-30 ("ETNG has a determination on the merits that it has a right to condemn the landowners' property, and the landowners now concede that ETNG possesses this right. Success on the merits for ETNG is therefore apparent.")

The question before the Fourth Circuit was not whether the gas companies could condemn private property, but whether the gas companies could have immediate possession of the land. *See Mountain Valley*, 915 F.3d at 209 ("Thus, the only question before us is whether Mountain Valley may gain access to those easements now, or whether it must wait to start construction until the district courts can sort out just compensation."); *Sage*, 361 F.3d at 818 ("immediate possession" is the "main question"). The Fourth Circuit held that a district court's "equitable power to grant the remedy of immediate possession through the issuance of a preliminary injunction" is conditioned on a finding that the party seeking possession "has the substantive right to condemn property." *Sage*, 361 F.3d at 828; *see also Mountain Valley*, 915 F.3d at 215.

This case differs from *Mountain Valley* and *Sage* on every level. *First*, because PSEG does not have the right to condemn private property, *see* MTD at § IV(A), it did not and could not bring an eminent domain action. In PSEG's own words, only after "the issuance of a CPCN" will it "be authorized by law to proceed with eminent domain cases to acquire the properties necessary to

construct the MPRP." ECF 1 at ¶ 418. In *Mountain Valley* and *Sage*, by contrast, the gas companies sought immediate access to property after filing eminent domain proceedings.

*Second*, whether PSEG will ever secure the power of eminent domain is an open question before the PSC. *See* MTD at § IV(B). By contrast, in *Sage* and *Mountain Valley*, the Fourth Circuit reasoned that a favorable determination on "the substantive right to condemn" was a prerequisite to a court "grant[ing] the remedy of immediate possession through the issuance of a preliminary injunction." *Sage*, 361 F.3d at 828. Because there has been no determination that PSEG will ever have that right, injunctive relief is unavailable. *See N. Border Pipeline Co. v. 86.72 Acres of Land*, 144 F.3d 469, 472 (7th Cir. 1998) ("Northern Border cannot gain immediate possession of the property through a preliminary injunction because it did not present an argument grounded in substantive law establishing a preexisting entitlement to the property.").

*Third*, in *Mountain Valley* and *Sage*, the court had ensured just compensation by requiring the condemnors to deposit with the court at least their estimate of just compensation. *Mountain Valley*, 915 F.3d at 212-13; *Sage*, 361 F.3d at 824-25. PSEG, by contrast, has offered nothing, and Respondents have no assurance of just compensation. Such action is unconstitutional. *See infra* at Arg. § IV (right to compensation for temporary takings).

In sum, the cases PSEG cites as "instructive" on the issue of irreparable harm lend no support for the relief it seeks. ECF 124-1 at 22. And substantively, the specific items PSEG references as the basis for its harm fall woefully short of what the law deems irreparable.

**B. PSEG's stated harm is not irreparable.**

In the first instance, PSEG argues it will suffer irreparable harm absent injunctive relief because, without such relief, it cannot put the MPRP into service by June 1, 2027. But PSEG cannot meet the in-service date no matter what happens here. Multiple events independent of this

litigation stand in PSEG's way. *See* Declaration of James Ballard ("Ballard Decl.") (**Exhibit 3**). The primary unknown is when and how the PSC will decide the CPCN Application. PSEG presents a swift and favorable outcome as a *fait accompli*, but the PSC has said no such thing.

While COMAR 20.79.01.07 imposes a one-year deadline for decisions on electric generating station CPCN applications, there is no equivalent deadline for the PSC to take action on transmission line applications, as here. And unless PSEG obtains a CPCN, it can neither "begin construction" nor "exercise a right of condemnation." PU § 7-207(b)(3)(i).

Plus, recent developments in the PSC proceeding doom PSEG's chances of meeting the June 1, 2027, in-service date. On July 28, 2025, less than two weeks *after* PSEG filed this action, the PSC's Office of Staff Counsel recommended a procedural schedule (first proposed by the PPRP) that would set March 26, 2027 as the "target final order date" for PSEG's CPCN Application.  Ex. 2 at 3-6. Assuming the PSC adopts the schedule recommended by its own Staff Counsel, the PSC will not decide PSEG's CPCN Application until the spring of 2027. In that circumstance, PSEG could not possibly "begin construction on the MPRP in the first quarter of 2026 and, in turn, place the MPRP into service by June 1, 2027[.]" ECF 124-1 at 22.

PSEG also misconstrues the role of the PPRP in repeatedly arguing that injunctive relief is necessary "to conduct the surveys *required* by PPRP." *See* ECF 124-1 at 4 (emphasis added). It is true that the PPRP has requested certain surveys. But the PPRP acts only in an advisory role in PSC proceedings; it cannot direct anything to be done. *See, e.g.,* Md. Code Ann., Nat. Res. § 3-306(b)(2) (requiring the PPRP to make recommendations). And here, the PPRP has merely recommended that the PSC deem PSEG's CPCN Application incomplete because, among various reasons,[7] the application omitted the following field-based surveys:

---

[7] The PPRP laid out multiple reasons why the CPCN Application is incomplete, separate and apart from the lack of field-based surveys. *See* ECF 3-5.

- o Wetland Delineations – necessary for the *entirety* of the Project ROW.
- o Forest Stand Delineations – necessary for the *entirety* of the Project ROW.
- o Geotechnical surveys – necessary for the *entirety* of the Project ROW.
- o Sensitive Species Project Review Areas (SSPRA) surveys – the SSPRA field surveys should be conducted on those parcels identified by the DNR Wildlife Heritage Service (WHS).
- o Maryland Historical Trust (MHT) required field surveys – the MHT field surveys should be conducted on those parcels identified by MHT as being of concern.

ECF 3-5 at 4-5 (emphasis added).

PSEG argues that the MPRP "will be delayed" or "even fully stymied" absent injunctive relief to conduct these surveys (ECF 124-1 at 30-31), but in truth, the PSC has never concluded that PSEG's CPCN Application is incomplete or that the surveys PPRP recommended are actually required. Plus, even with injunctive relief, PSEG cannot address all concerns raised by the PPRP.

As PSEG concedes, "[a]ny surveys that involve invasive activities [such as geotechnical surveys] on private property are not legally authorized prior to the issuance of a CPCN without the express approval of the property owner." *See* PSEG's April 10, 2025 Letter to the PSC (**Exhibit 4**), at 6. Thus, PSEG cannot satisfy PPRP's recommendation to obtain geotechnical surveys "for the entirety of the Project ROW," ECF 3-5 at 4, unless PSEG secures consent from all affected landowners, including Respondents.[8] Similarly, absent consent from all landowners along the route, PSEG also cannot satisfy the PPRP's recommendation to obtain wetland delineations, forest stand delineations, and geotechnical surveys "for the entirety of the Project ROW." *Id.* at 4.

Far from establishing a "*present* threat of irreparable harm" absent injunctive relief, *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991) (emphasis added), PSEG's assertion of a mid-2027 in-service date is wildly unrealistic. PSEG would need the PSC

---

[8] If PSEG needs geo-technical borings to secure a CPCN and has no legal basis to obtain them, that is one more reason PSEG will not meet the in-service date even with injunctive relief. *See Mackie v. Mayor & Com'rs of Town of Elkton*, 265 Md. 410, 420-22 (1972) (predecessor statute to RP § 12-111 does not authorize state instrumentalities having power of eminent domain to enter land to make geological investigations); *see also* MTD at § IV(A)(ii).

to reject the procedural schedule proposed by its own Staff Counsel (Ex. 2 at 3-6), then quickly grant a CPCN. PSEG would also need a near flawless execution on its construction plans. That is unlikely.

In PSEG's own words, "the project route" itself "poses uncertainty and risk," and "an in-service date of June 1, 2027," means "an aggressive timeline to execute and complete all construction activities." *See PSEG Renewable Transmission LLC*, Petition for Declaratory Order Requesting Approval for Transmission Incentives, FERC Docket No. EL-24-103 (Apr. 15, 2024), at 31 (Prepared Testimony of Jason Kalwa at 9). PSEG must also "manage ROW permitting and land acquisition risks associated with the greenfield line routes in a compressed period of time…, and in these efforts, may encounter local opposition from landowners." *Id.*; *see also id.* at 23, 29, 31-32 (Prepared Testimony of Jason Kalwa at 1, 7, 9-10) (describing the regulatory, siting, permitting, environmental, construction, and land acquisition risks, to name a few).

More practically, it is speculation to conclude that PSEG could build a transmission line across Maryland in less than eighteen months even under ideal circumstances. As with every construction project, a host of factors may cause delay, including labor shortages, challenges with the procurement of material, and legal obstacles.

On that point, separate litigation will likely derail PSEG's plans. Through this lawsuit and *Arentz*, PSEG has sued 318 landowners. This computes to 77.75% of all landowners along the proposed MPRP route. *See In re Application of PSEG Renewable Transmission LLC,* Case No. 9773 (Md. Pub. Serv. Comm'n 2024) Doc. 1, Attachment B, App'x F, *Proposed Route Analysis Results,* at F-3 ("Unique property owners within ROW (count) 409") (**Exhibit 5**).[9] An additional

---

[9] In addition, PSEG needs to fortify existing roads and construct "new access routes." *See In re Application of PSEG Renewable Transmission LLC*, Case No. 9773 (Md. Pub. Serv. Comm'n 2024), Doc. No. 119, *Environmental Review Document Supplement,* at 2. "There are an estimated 303 access roads on and off the MPRP ROW inclusive of preferred and alternative options. The access roads average 16 feet to 25 feet wide so large equipment including a

91 landowners have not been named in either lawsuit. Because PSEG's surveying needs extend well beyond the private property owned by Respondents, a preliminary injunction in this case will not fully address PSEG's stated harm. *See also* MTD at § IV(C).

Put differently, PSEG's potential injury is "conditioned on possible future events," *Direx Israel, Ltd.*, 952 F.2d at 816, any of which could frustrate PSEG's ability to put the MPRP in service by June 1, 2027. Beyond the inordinate risk of meeting an aggressive construction schedule, PSEG confronts uncertainty at the PSC, uncertainty around mass land acquisition, uncertainty around unfiled litigation, and uncertainty around surveying needs. Each uncertainty may prevent the MPRP from going into service, in mid-2027 or ever, irrespective of what happens in this case. Ballard Decl. at ¶ 9. That may be "problematic" for PSEG, but it is not enough to warrant injunctive relief. *Direx Israel, Ltd.*, 952 F.2d at 816. PSEG cannot establish that a preliminary injunction, standing alone, will avert its alleged harm. *See, e.g., Blue Water Baltimore, Inc. v. Mayor & City Council of Baltimore*, 635 F. Supp. 3d 392, 403 (D. Md. 2022) ("the mere possibility of irreparable harm in the absence of the requested relief is not sufficient to support the issuance of a preliminary injunction"); *SH Franchising, LLC v. Newlands Homecare, LLC*, No. CV CCB-18-2104, 2019 WL 356658, *5 (D. Md. Jan. 29, 2019) (because movant was "not suffering actual and imminent harm and instead has shown only the mere possibility of future harm," movant could not establish a likelihood of "irreparable harm absent a preliminary injunction").

Plus, June 1, 2027 is a provisional deadline. As PSEG writes, its obligation "to construct and place the MPRP into service by June 1, 2027" comes from the DEA executed by PJM and

---

drill, crane, concrete trucks and structure sections can be delivered to the site." *Id.* Large construction equipment traversing rural land will do permanent damage to the land on the proposed MPRP route and the surrounding land that PSEG occupies during construction.

PSEG. ECF 124-1 at 7; *see also* ECF 3-1 (copy of DEA). It is true that the DEA sets June 1, 2027 as the milestone, or deadline, for completing the MPRP. ECF 3-1 at 20. However, it is equally true that a failure to meet the in-service deadline does not automatically trigger termination of the DEA. In that circumstance, PJM "shall conduct a re-evaluation" and determine whether to retain the MPRP. *Id.* at 8 (§ 7.4). If the re-evaluation results in PJM retaining both the MPRP and PSEG's designation for the MPRP, "the Parties shall modify this Agreement, including Schedules, as necessary." *Id.* This leaves open the possibility that PJM may modify the in-service date, particularly if any delay is beyond PSEG's control. *See* Ballard Decl. at ¶ 11.

Much like it is speculation to conclude that PSEG will suffer any harm, let alone irreparable harm, for failing the milestone deadline, it is also speculation to conclude that PSEG will incur irreparable monetary harm if the MPRP does not proceed rapidly. PSEG posits that, absent injunctive relief, it will incur two categories of monetary harm: (1) lost revenues attendant to a delay in completing the MPRP, and (2) because PSEG "would be required to redraw the proposed line for the MPRP and submit a new CPCN application" to the PSC, it will "again incur" nearly $5 million in siting, environmental, and consulting fees plus "significant legal fees" and other costs. ECF 124-1 at 30-32.

Economic losses generally do not constitute irreparable harm. *Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date,… weighs heavily against a claim of irreparable harm.") (internal citations omitted); *see also Pers. v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476, 479

(D. Md. 2006). Even if this were a rare case in which monetary damage alone could constitute irreparable injury, PSEG is unlikely to suffer any economic losses under any circumstance.

In claiming potential lost revenues as irreparable injury, PSEG necessarily presupposes that its CPCN Application will be granted. But no one knows when or how the PSC will rule. The potential revenue that PSEG *might* earn from an unapproved transmission line is not actual, imminent, and irreparable injury. *Winter*, 555 U.S. at 22 (the "'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (emphasis in original)).

For that same reason, PSEG's reliance on *Arentz* is misplaced. There, this Court accepted the premise that "PSEG has shown that the project could be substantially delayed in the absence of an injunction," holding that PSEG "likely will suffer substantial monetary harm from anticipated future financial losses (such as loss of revenue) as a result of the delay." 2025 WL 1725814, at *22. This decision rests of two critical assumptions: *first*, that the PSC will grant the CPCN Application, and *second*, that PSEG will construct the MPRP and put it into service. Neither is certain to occur.

"The very function served by requiring a 'clear showing of irreparable harm' that must be 'actual and imminent' rather than 'remote [and] speculative,' is to limit the deployment of the heavy artillery of preliminary injunctive relief to situations in which it is readily apparent to the court that such relief is actually necessary to prevent a harm from occurring." *In re Microsoft Corp. Antitrust Litig.,* 333 F.3d 517, 530 (4th Cir. 2003) *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). "When the court concludes that it is impossible to ascertain *when* such tipping might occur and that it cannot say with confidence that the harm is more likely than not to occur *at all*, the proper conclusion to draw is that the plaintiff has failed to

make the clear showing required." *Id.* (emphasis in original). The mere "possibility" of irreparable harm is never sufficient. *Winter*, 555 U.S. at 22.

      *Mountain Valley* and *Sage* do not compel a different result. In both cases, the petitioners had a CPCN and thus a clear path to construct the natural gas line and generate revenue. Here, it is unknown whether PSEG will secure approval for the MPRP, let alone generate revenue from it.

      In addition, PSEG has not produced any competent evidence for its projected lost revenues. The only support is a single paragraph in the self-serving Declaration of Dawn Shilkoski. ECF 124-1 at 26 (citing ECF 3 at ¶ 32). Ms. Shilkoski alleges, in conclusory fashion, that PSEG will earn a handsome return if the MPRP is put into service. Her projections, like all economic projections for unapproved businesses, are inherently speculative. *See, e.g.*, *Coastland Corp. v. Third Nat. Mortg. Co.*, 611 F.2d 969, 977 (4th Cir. 1979) (in analyzing the availability of lost profits for a new business, observing that "such a business is a speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages") (internal citations omitted). It is also speculation to conclude that a preliminary injunction will abate projected losses. A host of issues unrelated to PSEG's claim make it equally plausible that the MPRP and PSEG's potential revenue therefrom might never materialize. And if the MPRP stalls, the $5 million PSEG allegedly spent on consultants and attorneys is eligible for full recovery under the FERC Order.

      By its express terms, the FERC Order authorizes 100% recovery of prudently incurred costs if the MPRP is abandoned and eliminates any risk that PSEG will suffer irreparable economic harm. *See* Declaration of Scott Molony (**Exhibit 6**), ¶ 9(a). The Abandoned Plant Incentive ensures that PSEG "will recover every dollar it invests on a cost basis so long as the investment can be justified as prudently incurred in furtherance of, and consistent with, the planning, design,

permitting, siting, and construction of the" MPRP. *Id.* at ¶ 9(b). Indeed, FERC determines whether costs were prudently incurred and applies a presumption of prudence. *Potomac-Appalachian Transmission Highline, LLC & PJM Interconnection, L.L.C.*, 152 FERC ¶ 63,025, 66,165 at P 73 (2015); *Re New England Power Co.*, 31 FERC ¶ 61,047, 61,082 (1985) ("[G]ood faith is presumed on the part of the utility absent a showing of inefficiency or improvidence (*West Ohio Gas Co. v. Pub. Utilities Comm'n of Ohio*, 294 U.S. 63, 72 (1935)).").

Given that PSEG's projected lost revenues for an unapproved transmission line fall well short of irreparable injury and that PSEG has a path to recover 100% of its expenses, its claim of irreparable economic harm absent injunctive relief is inaccurate. By comparison, the hundreds of citizens affected by the MPRP merely insist that PSEG follow the law before forcibly co-opting private property for corporate gain. That PSEG may incur costs along the way, albeit fully reimbursable, is a byproduct of its conscious decision to pursue a transmission line extending from the Maryland-Pennsylvania border to the Maryland-Virginia border through greenfields rather than brownfields or existing easements.

PSEG next erroneously contends that its inability to exercise access rights under RP § 12-111 "alone is sufficient to demonstrate irreparable harm." ECF 124-1 at 32. Setting aside that PSEG does not have a "statutory right" to enter Respondents' properties for the reasons explained in Respondents' MTD, multiple courts have held that the loss of a statutory right, by itself, does not constitute irreparable harm. *See, e.g.*, *Heritage Found. v. U.S. Dept. of State*, No. CV 24-2862 (TJK), 2024 WL 4607501, at *5 (D.D.C. Oct. 29, 2024) ("Plaintiffs cannot rely only on a statutory entitlement to expedited processing to show irreparable harm."); *US Airline Pilots Ass'n v. Pension Benefit Guar. Corp.*, No. CV 09-1675 (HHK), 2011 WL 13273132, at *5 (D.D.C. Mar. 14, 2011) ("[T]he harm at issue in *Hi-Tech* and *Apotex* was not the loss of the entitlement *per se*, but rather

the lasting and significant economic consequences thereof."); *Metso Mins., Inc. v. Powerscreen Int'l Distribution Ltd.*, 788 F. Supp. 2d 71, 74 (E.D.N.Y. 2011) ("However, the Supreme Court and the Federal Circuit have made it clear that the mere violation of the [statutory] right to exclude alone does not necessarily result in irreparable injury" (internal citation omitted)); *Guar. Corp.*, No. 09-1675 (JR), 2010 WL 3168048, at *3 (D.D.C. Apr. 16, 2010) ("USAPA's alternative argument is that its loss of a 'clear statutory entitlement' is irreparable harm, 'because once the statutory entitlement has been lost, it cannot be recaptured.' The 'statutory right' that USAPA invokes here is a right to adequate stewardship of the Plan by the trustee. The argument is creative, but unsupported, and it is unconvincing." (internal citation omitted)).

In *Heritage Foundation*, the plaintiffs sought an order compelling agencies to process expedited Freedom of Information Act ("FOIA") requests, arguing that "[a] wrongful denial of a statutory right to expedited processing necessarily causes irreparable harm because the clock cannot be wound back." 2024 WL 4607501, at *1, *12. The court disagreed, finding that "'something more' is required here…" *Id.* at *13. That "something more" is illustrated throughout cases where a deprivation of a statutory right was found to constitute irreparable harm. In those cases, the right was clearly conferred, *Planned Parenthood S. Atl. v. Baker*, 326 F. Supp. 3d 39, 45 (D.S.C. 2018), *aff'd*, 941 F.3d 687 (4th Cir. 2019), the plaintiff showed "lasting and significant economic consequences" of its imminent deprivation, and the right was "by its nature, fleeting," *i.e.*, could not be restored. *US Airline Pilots*, 2011 WL 13273132, at *5; *see also Permanence Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904, at *6 (D.D.C. June 10, 2024) ("The Court agrees that Par has shown that it will likely suffer irreparable harm because the loss of its statutory right to the 30-month stay, and Supplement 13's presence in the market for even this six-week period, will lead to *permanent* price erosion for Par's … product…" (emphasis added)).

PSEG cannot satisfy those criteria. First, the statutory right at issue is not clearly conferred. In *Planned Parenthood South Atlantic*, which PSEG cites (ECF 124-1 at 32), the court found that a statute "unambiguously confers a right upon Medicaid-eligible patients" to obtain assistance from any qualified and willing healthcare provider, and the plaintiff "would suffer irreparable harm in the absence of a preliminary injunction because she would be deprived of her statutory right to select the qualified and willing provider of her choice." 326 F. Supp. 3d at 45, 48. But here, as explained in Respondents' MTD, there is no statute that unambiguously confers the power of eminent domain on PSEG, a prerequisite for an order under RP § 12-111.

Second, PSEG will not suffer actual injury if denied access to Respondents' properties, let alone the "lasting and significant" economic injuries that constitute irreparable harm. *US Airline Pilots*, 2011 WL 13273132, at *5. In *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 289 F. Supp. 3d 73 (D.D.C. 2018), the court found that the use of boilerplate notices in violation of the Sunshine Act was not enough to demonstrate irreparable harm, because "Plaintiffs have offered no actual *proof* that the absence of specifics has adversely impacted their participation in past meetings or is likely to have such effect in the future." *Id.* at 79 (emphasis original). However, evidence showed that the defendant's repeated failure to give notice of subcommittee meetings had in fact deprived plaintiffs of their statutory right to attend and participate in those specific meetings, therefore the plaintiffs had "met the high bar of irreparable harm" warranting a limited injunction on that narrow issue. *Id.* at 80. Here, PSEG "offered no actual *proof* that," absent access to Respondents' land, it will suffer longstanding economic injuries in the near future. *Id.* at 79. Again, the PSC has not found that PSEG's application is incomplete or surveys are needed. And if the MPRP is later abandoned, 100% of PSEG's prudently incurred expenses will be

recovered under the FERC Order. Without any lasting and significant injuries that will flow from a deprivation of rights, PSEG cannot demonstrate irreparable harm.

Lastly, PSEG's claimed access rights under RP § 12-111 are not intrinsically fleeting. In *Fairy-Mart v. Marathon Petroleum Co.*, LP, No. 3:17-CV-1195 (MPS), 2017 WL 5140514 (D. Conn. Nov. 6, 2017), the court enjoined the defendant from completing sales that violated plaintiffs' statutory right of first refusal, because "[d]enying the motion for a preliminary injunction and allowing Marathon to close the sale of their locations to PMG—without first determining whether Marathon offered them a right of first refusal of a 'bona fide offer' as required by law—would *forever* deprive the plaintiffs of the opportunity to purchase these stations." *Id.* at *6 (emphasis added). "The plaintiffs have shown irreparable harm because, once PMG purchases their stations, their statutory right of first refusal—whatever its proper scope—will be irretrievably lost, and money damages for that loss would be extremely difficult to calculate." *Id.* at *1. PSEG's purported right to access Respondents' properties and build the proposed transmission line will not be "irretrievably" lost if the requested injunction is denied. If the PSC determines that surveys are in fact needed, and the legislature confers upon PSEG the power of eminent domain, PSEG then could seek the access it prematurely seeks now. Nor will damages be "difficult to calculate" or unrecoverable if the MPRP is abandoned. *Id.* at *1. Again, under the FERC Order, PSEG can recover all of its prudently incurred costs if the MPRP never materializes.

In summary, PSEG has not shown "a present or immediate need for preliminary relief." *Direx Israel, Ltd.*, 952 F.2d at 816. "Remembering that preliminary injunctions are 'extraordinary remedies' involving the exercise of 'very far-reaching power' to be granted only 'sparingly' and 'in limited circumstances,' the grant of such relief in this case, where the harm" to PSEG is "not present or immediate but merely problematic, conditioned on possible future events, would seem

-22-

contrary to" the Fourth Circuit's "stated rule: A plaintiff, seeking preliminary relief, must show the present threat of irreparable harm." *Id.*

**IV.    The balance of equities does not warrant an injunction.**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24 (citing *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). Here, the balance of equities tips decidedly in favor of the Respondents.

Context is appropriate. On the one hand, PSEG is a subsidiary of Public Service Enterprise Group, Inc., a publicly traded company headquartered in New Jersey, with a market cap exceeding $40 billion, a reported $54.6 billion in total assets and $10.3 billion in total revenue in 2024. ECF 2; *Facts & Figures*, PSEG, https://corporate.pseg.com/aboutpseg/companyinformation/ factsandfigures (last visited Aug. 5, 2025). This billion dollar enterprise claims it stands to make millions more from the MPRP, all while having no economic risk in the endeavor because of lucrative FERC incentives. In contrast, Respondents are a group of 201 private citizens, small businesses, and non-profit entities who happen to own property along the proposed MPRP route.

The proposed MPRP route cuts through 522.6 acres of cultivated cropland. Ex. 5 at F-3. Respondents include farmers operating working farms with livestock, row crops, or permanent plantings. *See* Declaration of Nancy Gardetto ("Gardetto Decl.") (**Exhibit 7**) at ¶¶ 8-9, 21; Declaration of Lisa Gaver ("Gaver Decl.") (**Exhibit 8**) at ¶¶ 8, 10-11. Indefinite access to sensitive farmland could result in biosecurity breaches. Gardetto Decl. at ¶ 21; Gaver Decl. at ¶ 17. Such access could also cause physical damage to fields, fencing, irrigation systems, or conservation practices. Gaver Decl. at ¶ 19. A disruption to accommodate PSEG could upend multi-generational

family farms. Gaver Decl. at ¶ 9-10, 13. This harm to Maryland agribusiness is particularly egregious given that PSEG may never secure PSC approval to build its transmission line.

The homeowner-Respondents and their families also derive immense benefit from their land. *See* Declaration of Mohammed Tariq Alvi ("Avli Decl.") (**Exhibit 9**) at ¶¶ 10, 12-15. To disrupt familial living quarters before PSEG has the right to advance its plans will cause premature and unnecessary harm to landowners.

The small business-Respondents will face comparable hardship if PSEG can enter their private property. A blanket right of entry for indeterminate surveying with no temporal limitations will upset, if not jeopardize, this invaluable use. Gaver Decl. at ¶ 14, 12; *see also* Declaration of Franklin Vleck, Jr. ("Vleck Decl.") (**Exhibit 10**) at ¶ 17, 18, 20, 22-23.[10]

Parcels across the proposed MPRP also benefit from conservation easements. Gardetto Decl. at ¶ 7. The proposed MPRP route runs through 245.8 acres of conserved land and lies just 500 feet from another 1,801.7 acres of conserved land, Ex. 5 at F-2, which risks the preservation of sensitive ecosystems.

To reiterate, the PSC has not determined whether PSEG can build the MPRP and acquire associated property rights. Uncertainty notwithstanding, PSEG asks the Court to authorize the immediate entry onto Respondents' private property "to make surveys, run lines or levels, or obtain information" from now until its CPCN Application "is granted or denied." ECF 124-8 at 1. This right of entry would encumber Respondents' property for years. Ex. 2 at 3-6. Worse, the encumbrance would be for the specific purpose of "acquisition and future use of the properties in connection with the" MPRP. ECF 124-8 at 1.

---

[10] In the interest of brevity, this Opposition does not include Declarations from all Respondents. Respondents reserve the right to produce additional evidence supporting their positions, by Declaration or otherwise, if and as appropriate.

Objectively, PSEG seeks to burden every Respondents' property with a Court-ordered right of entry under the auspice that PSEG might exercise eminent domain in the future. This qualifies as a compensable, temporary taking. And yet, flouting its legal obligations once more, PSEG offers no compensation for an encumbrance that would interfere with the Respondents' use and enjoyment of their land, and likely render the land unsaleable indefinitely.

The duty to pay just compensation when taking private land for public use is a bedrock principle of state and federal law. Md. Const. Art. III, § 40; U.S. Const. Amend. V, cl. 4. When a condemnor "physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). This duty applies equally to temporary and permanent takings. *Ark. Game & Fish Comm'n v. U.S.,* 568 U.S. 23, 32-33 (2012).

"The right to exclude is 'one of the most treasured' rights of property ownership." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). "Given the central importance to property ownership of the right to exclude, it comes as little surprise that the Court has long treated government-authorized physical invasions as takings requiring just compensation." *Id.* at 150. After analyzing the relevant precedent on this topic, the *Cedar Point* Court observed:

> The upshot of this line of precedent is that government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation. As in those cases, the government here has appropriated a right of access to the growers' property, allowing union organizers to traverse it at will for three hours a day, 120 days a year. The regulation appropriates a right to physically invade the growers' property—to literally "take access," as the regulation provides. Cal. Code Regs., tit. 8, § 20900(e)(1)(C). It is therefore a *per se* physical taking under our precedents.

*Id.* at 152.

-25-

Entering a preliminary injunction would cloud title to Respondents' properties. PSEG would have the legal right to "physically invade" Respondents' land for the purpose of completing studies anywhere and everywhere on that land until the PSC process concludes. If any Respondent wished to sell their property, the seller would convey title subject to PSEG's "acquisition and future use" of said property for the MPRP. *See Sokel v. Nickoli*, 97 N.W.2d 1, 5 (Mich. 1959) ("the notice of proposed taking by eminent domain creates a cloud which prevents the plaintiffs from selling their property or otherwise using it without hindrance"). No prudent buyer would purchase property under cloud of condemnation without receiving a considerable discount from market value, if at all. *Reichs Ford Rd. Joint Venture v. State Roads Comm'n of the State Highway Admin.*, 388 Md. 500, 520-21 (2005) (pre-condemnation diminution in property value is compensable under RP § 12-105). The properties would, in effect, "become a millstone around the neck of" Respondents. *Id.* at 521. Worse, the cloud on title would not benefit a party with the present right to acquire property by eminent domain, but instead an out-of-state entity that admittedly has no present authority to condemn private property.[11]

*J.L. Matthews, Inc. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 368 Md. 71 (2002), is instructive. The Supreme Court of Maryland recognized that, until a condemnor actually takes property, the "owner is free to use the property as he, she, or it normally would[.]" *Id.* at 104 n. 28. "By obtaining an injunction in this case, however," the condemnor "artificially set the fair market value of the Property as of the date of the injunction. That act is in total contravention of the tenets of established condemnation law." *Id.* Here, an injunction would put the world on notice

---

[11] The power to seize private property by eminent domain is conditioned on the condemnor putting such property to public use. Md. Const. Art. III, § 40; U.S. Const. Amend. V, cl. 4. The MPRP is proposed to address the energy demands of private enterprise in Virginia. *See supra* at n. 3. Granting PSEG the relief it seeks would empower a private company from New Jersey to acquire private property in Maryland for the benefit of private enterprise in Virginia. Such a holding eviscerates the constitutional mandate that property may only be taken for public use.

that Respondents' properties are subject to "acquisition and future use" for the MPRP, thereby decimating the marketability of each property. *Litz v. Maryland Dept. of Env't*, 446 Md. 254, 267 (2016) (inverse condemnation claim arises from "hanging a credible and prolonged threat of condemnation over the property in a way that significantly diminishes its value") (quoting *Coll. Bowl, Inc. v. Mayor & City Council Of Baltimore*, 394 Md. 482, 489 (2006)).

The risk of losing property rights to eminent domain is a risk inherent to private landownership. To mitigate that risk, takings jurisprudence contemplates two important features: (1) the party taking property rights has secured the power of eminent domain; and (2) the condemnor has paid just compensation for the imposition. PSEG has done neither.

As Justice Holmes wrote more than a century ago: "The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Mackie*, 265 Md. at 422 (quoting Justice Holmes with approval); *State Roads Comm'n v. Jones,* 241 Md. 246, 250 (1966) (same). Yet, Justice Holmes cautioned: "When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears." *Pennsylvania Coal Co.*, 260 U.S. at 415.

PSEG has made Justice Holmes' fear a reality. It claims entitlement to a right of entry while ignoring the constitutional guarantee of just compensation. A "desire to improve the public condition," however strong, "is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Id.*[12]

---

[12] The cases cited by PSEG concerning the constitutionality of pre-condemnation surveys do not support the extensive right of entry that PSEG asks this Court to provide. *Steuart v. City of Baltimore*, 7 Md. 500 (1855) involved an ordinary land survey necessary for the condemnation proceedings, and the court expressly stated that "an entry to grade, or to prepare the ground" would be illegal. *Id.* at 516. Likewise, in *LaFontaine's Heirs at L. & Next of Kin v. LaFontaine's*

To permit PSEG to forcibly enter private land without the power of eminent domain and without paying anything for such entry is to permit PSEG to violate the state and federal constitutions.[13] There is no greater harm to private landowners. And PSEG's familiar reliance on *Arentz* does not compel a different result. Again, the Supreme Court "has long treated government-authorized physical invasions as takings requiring just compensation," *Cedar Point*, 594 U.S. at 150, even if the imposition is "temporary" or "minimally invasive." *Arentz*, 2025 WL 1725814, at *22. Accordingly, when the extreme harm to Respondents is balanced against the hypothetical harm PSEG presents as irreparable, the answer is clear: an injunction cannot issue.

## V.    The public interest decisively favors denying the requested injunction.

Granting a preliminary injunction is not in the public interest, either. As explained above, such relief would advance the economic interests of a publicly-traded company while trampling the constitutional rights of hundreds of private citizens.

PSEG predicts disaster absent injunctive relief. It claims that "if the MPRP is not in service by June 1, 2027, the consequences to the region's electric grid will be severe," with "[m]illions of residential and commercial consumers… experiencing rolling blackouts and grid collapse." ECF 124-1 at 10.

As a threshold matter, PSEG offers scant evidence for its dire predictions. The PSC may deny the CPCN Application or delay a decision well into 2027 (Ex. 2 at 3-6), either of which would prevent PSEG from putting the MPRP in service by June 1, 2027. And that is not PSEG's only obstacle.  PSEG faces many challenges associated with (i) securing approvals from various federal,

---

*Heirs at L. & Next of Kin*, 205 Md. 311 (1954), the court indicated that "[a]uthorized temporary occupancy or momentary entry for purposes of survey or inspection is not a taking," but also indicated that "actual entry upon land and its devotion to public use for more than a momentary period" was a taking. *Id.* at 320, 322.

[13] *Mountain Valley* and *Sage* are again supportive of Respondents' position.  In each case, the Fourth Circuit reasoned that the payment of just compensation into court for the landowners' benefit mitigated any harm arising from the condemnors taking immediate possession of the land. *Mountain Valley*, 915 F.3d at 219-20; *Sage*, 361 F.3d at 829.

state, and local government bodies, (ii) acquiring property rights from hundreds of landowners, and (iii) meeting a compressed construction schedule. *See supra* at Arg. § III(B). Even assuming, *arguendo*, that regional energy demand could surpass supply at some point in the future, it is pure speculation to conclude that the injunctive relief PSEG seeks will rebalance the scale.

The geopolitical landscape on energy matters is constantly evolving. The trend toward renewable energy sources is at odds with recent efforts to strengthen protections for conventional energy sources. Further, contingency plans are already in place to ensure that Maryland does not experience any negative effects should the MPRP and a broader package of grid upgrades not materialize, including keeping the Brandon Shores Power Plant and H.A. Wagner Generating Station operational through at least May 31, 2029. *See* Ballard Decl. at ¶ 14 and Ex. C & D thereto. Plus, the agreement between PJM and PSEG expressly contemplates that the MPRP may be delayed or cancelled. ECF 3-1 at 8 (§ 7.4). FERC, too, understands this risk, as evidenced by its award of broad economic protections to PSEG should the MPRP stall or fail. *See* Ex. 1.

PSEG has produced no evidence that the MPRP, standing alone, could avert its predictions of disaster. On the contrary, the evidence demonstrates that the earliest the MPRP could provide electricity to any end user is June 2030. Ballard Decl. at ¶ 13. Thus, if harm is bound for Marylanders in 2027, as PSEG predicts, there is no possibility that the MPRP neutralizes that harm.

To counter these points, PSEG once more relies on *Arentz*, and once more PSEG's logic is flawed. While the *Arentz* Court observed that "advancing projects like this one is generally in the public interest[,]" 2025 WL 1725814, at *23, the court did *not* "opine on whether construction of a transmission line, and specifically on the route proposed by PSEG, would be in the public interest. That is a determination for the PSC to make[.]" *Id.* at *23, n.9. Furthermore, Respondents have never "second-guess[ed] the PPRP's determination that conducting" certain studies is

prudent. ECF 124-1 at 35 (citing *Arentz*). Respondents only highlight the truth: it is impossible for PSEG to fully address the PPRP's concerns through this case because PSEG elected to seek access rights to select properties along the proposed right-of-way. PSEG alone is to blame for that failure.

Moreover, and as addressed in Respondents' MTD, PSEG is asking the federal court to usurp the role of the state Public Service Commission. *See* MTD at § IV(B). It is for the PSC, not this or any other court, to determine whether the MPRP can advance. *Id.*; *see also Arentz*, 2025 WL 1725814, at *23, n.9. In fact, PSEG's arguments to the PSC for granting a CPCN mirror its arguments for injunctive relief. The public interest is best served by compelling PSEG to work through the PSC process and otherwise follow the law, not maneuver around it.

This is particularly important given what is at stake. If PSEG secures injunctive relief, a sweeping, unpaid encumbrance will burden private land along the MPRP's proposed route for the pendency of the PSC proceeding. ECF 124-8 at 1. Such relief would thumb the scale in PSEG's favor, at least implicitly, while the PSC process moves forward. And if PSEG prevails at the PSC, an "aggressive" construction schedule will lead to its hasty acquisition of property rights from hundreds of landowners in three Maryland counties without regard for the communities, families, and small businesses destroyed in its wake. Those with everything at risk make one simple ask: that PSEG fulfill all legal requirements before jeopardizing their property and their future.

## CONCLUSION

A preliminary injunction is an extraordinary remedy, awarded only upon a clear showing that plaintiff is likely to succeed on the merits, that plaintiff is likely to suffer irreparable harm, that the balance of equities weighs in favor of an injunction, and that the public interest, too, favors injunctive relief. PSEG has satisfied none of these elements. Accordingly, Respondents respectfully request that the Court deny PSEG's Motion for Preliminary Injunction.