**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**Northern Division**

| | | |
|---|---|---|
| PSEG RENEWABLE TRANSMISSION LLC, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | | Case No. 1:25-cv-2296 |
| ALVI PROPERTIES, LLC, *et al.*, | * | |
| | * | |
| Respondents. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**<u>PETITIONER PSEG RENEWABLE TRANSMISSION LLC'S REPLY MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION</u>**

Kurt J. Fischer (Bar No. 03300)
Venable LLP
210 W. Pennsylvania Avenue, Ste. 500
Towson, MD 21204
(410) 494-6200
kjfischer@venable.com

J. Joseph Curran III (Bar No. 22710)
Christopher S. Gunderson (Bar No. 27323)
Kenneth L. Thompson (Bar No. 03630)
Susan R. Schipper (Bar No. 19640)
Emily J. Wilson (Bar No. 20780)
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
(410) 244-7400
jcurran@venable.com
klthompson@venable.com
csgunderson@venable.com
srschipper@venable.com
ejwilson@venable.com

*Attorneys for Petitioner PSEG
Renewable Transmission LLC*

## INTRODUCTION

Moving Respondents[1] ("Respondents") fail to rebut PSEG Renewable Transmission LLC's ("the Company") manifest showing of the four elements required for a preliminary injunction.  The Maryland Department of Natural Resources' Power Plant Research Program ("PPRP") has required the Company to perform non-invasive field surveys that PPRP deems are necessary to assess the environmental impacts associated with the Company's application for a certificate of public convenience and necessity ("CPCN") to construct the Maryland Piedmont Reliability Project (the "Project" or the "MPRP").  The Company asks this Court to enter an order permitting the Company to temporarily access Respondents' properties to perform the requested surveys, consistent with Maryland law.  Denying the Company temporary, non-invasive survey access is unwarranted given the Company's demonstrable likelihood of success on the merits of its Petition for Injunctive Relief (ECF 1) and the irreparable harm that would result from further delay.

Unnecessarily delaying the Company's right of entry will doom the Company's CPCN application to an untenable purgatory state, where PPRP is unable to fulfill its statutory duty to assess the Project's impacts, and the PSC is consequently unable to fulfill its statutory duty to evaluate the merits of the CPCN application.  Such a result will also cause the Company to suffer significant monetary harms in the form of lost revenue and carrying costs, and it will continue to deprive the Company of its statutory right to enter Respondents' properties.  Respondents cannot point to any prejudice or material harm that will occur if the Company is granted the temporary access it seeks.  They also cannot articulate any reason why the Court should depart from its well-

---

[1] Moving Respondents are those identified in ECF 144.

reasoned conclusion in *PSEG Renewable Transmission LLC v. Arentz Family, LP*, --- F.Supp.3d ----, 2025 WL 1725814 (D. Md. 2025). The Company's Motion should be granted.

## ARGUMENT

### I.  The Company Seeks a Prohibitory, Not Mandatory, Injunction.

As a threshold matter, the Company seeks a prohibitory injunction—not a mandatory one, as Respondents claim.   While "mandatory injunctions alter the status quo, prohibitory injunctions 'aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted). The "status quo" is "the last uncontested status between the parties which preceded the controversy." *Di Biase v. SPX Corp.*, 872 F.3d 224, 228 n.4 (4th Cir. 2017) (citation omitted). Because mandatory injunctions disrupt the status quo, they are ordinarily disfavored and scrutinized more closely. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 223 (4th Cir. 2025).

Respondents argue that the "'last uncontested status' preceding this lawsuit is not in dispute," as "[n]o Respondent has consented to [the Company] entering their private property." ECF 144-1 at 14. But that is irrelevant. The Company has a statutory right to enter the Appellants' land under the plain language of RP § 12-111. Because that right is self-executing and does not require a court order to create it, the Company's right of entry is the "status quo." It is Respondents who have disrupted the status quo by obstructing the Company's exercise of its right. *See, e.g.*, *Julian Dev., LLC v. Old Vill. Mill, LLC*, 2014 WL 1414319, at *6 (D. Conn. Apr. 11, 2014) (injunction seeking to "refrain" opposing party from "interfering with [Plaintiff's] right to enter, excavate, remove, and sell stone … from the property" was prohibitory, not mandatory).

However, "where 'the applicants' right to relief [is] indisputably clear,' . . . mandatory injunctive relief remains available." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (citation omitted). As a result, even if the Company's requested injunction were mandatory and not prohibitive, the Company's clear entitlement to relief renders injunctive relief appropriate here. *See id.* at 223 (affirming order granting mandatory preliminary injunction seeking immediate land access to construct pipeline in order to avoid construction delays and meet in-service deadline).

## II. The Company Is Likely to Succeed On The Merits.

As explained in the Company's Motion, Md. Code Ann., Real Property ("RP") § 12-111 entitles the Company to a right of entry to conduct non-invasive surveys that PPRP states are needed to facilitate the PSC's review of the CPCN application. ECF 124-1 at 13-20. Because the statute expressly provides for this right of survey access, the Company's likelihood of success in the instant case is immense. Respondents' arguments to the contrary are based on an unsupported and strained interpretation of the statutory scheme that would frustrate, rather than advance, its purpose. For the reasons set forth in the Company's Opposition to Respondents' Motion to Dismiss (ECF 143-1), filed concurrently as ECF 146, the Company is entitled to these surveys under RP § 12-111 and therefore satisfies the first element. *See* ECF 146 at 2-14; *see also Arentz Family*, 2025 WL 1725814, at *13. The Company has thus demonstrated it is likely to succeed on the merits.

III.    **The Company Has Shown A Likelihood of Irreparable Harm Absent Preliminary Relief.**

A.    **The Company's CPCN Application Will Not Move Forward In A Timely Fashion Absent Preliminary Relief.**

There is no dispute that the Company will suffer irreparable harm absent the requested Court intervention here, as the actual harm that would result from a denial of the Company's Petition are obvious.   If the Company is unable to obtain immediate temporary access to Respondents' properties to conduct the surveys required by PPRP, it will be unable to provide PPRP with the field survey data PPRP has concluded it needs to assess the environmental and socioeconomic impacts of the Project on behalf of itself and several other State agencies as required by Maryland law.   Without PPRP's required assessment (on behalf of State agencies), the PSC's evaluation of the Project's impacts on certain statutorily enumerated factors, including the Project's impact on the environment, will be frustrated.   *See* PUA § 7-207(e).   Accordingly, the Project will be undermined and may never be constructed or placed into service.

Respondents argue that this harm to the Company is "not irreparable" because "[m]ultiple events independent of this litigation" might prevent the Company from meeting PJM's set in-service date of June 1, 2027.   ECF 144-1 at 17-18.   This argument misses the point.   The Company is not guaranteed to obtain a CPCN, even if it is able to conduct PPRP's required surveys, and it does not claim otherwise.   But without the ability to access Respondents' properties and obtain the information required by PPRP, the PSC's evaluation of the Company's application has yet to move forward.   In other words, the Company's inability to timely conduct the required surveys will singularly doom the Company's CPCN application to fail.   That is irreparable harm.

To that end, Respondents' various attempts to cast doubt on the Company's ability to meet the current in-service date set by PJM do not change this result.[2]

First, contrary to Respondents' argument, it does not matter that COMAR 20.79.01.07 does not impose a deadline for the PSC to take action on CPCN applications for transmission lines, in contrast to CPCN applications for generating stations. While the PSC might ultimately take longer than PJM's set in-service date to issue a decision on the Company's application, that does not change the fact that PPRP is demanding the survey data before the PSC takes *any* action on the Company's application (either with sufficient time for the Company to meet PJM's in-service deadline or not).

Second, the fact that the PSC's Office of Staff Counsel's ("Staff") recently proposed procedural schedule for the Company's CPCN application only reinforces PPRP's demands is a fact that supports the Company's motion, not the Respondents' opposition. Staff's recommendation of a procedural schedule that is contingent on the Company's ability to survey the properties only serves to underscore the need for a preliminary injunction affirming the

---

[2] To the extent Respondents rely on the Declaration of James Ballard (ECF 144-4), it should be disregarded. Mr. Ballard appears to hold himself out as an expert in electric power engineering who was previously employed by FERC and has testified before FERC numerous times. Without identifying any methodology or employing any analysis, Mr. Ballard then testifies that, "[b]ased on [his] professional experience, [the Company] is unlikely to meet its construction goals for the MPRP" for various reasons. (*Id.* ¶ 9.) Notwithstanding that none of Mr. Ballard's professional experience has been before the PSC (*see id.*, Ex. A), Mr. Ballard relies on a prior CPCN case before the PSC to form his opinion. (*Id.* ¶ 9(e).) Mr. Ballard also opines that PJM Interconnection, L.L.C. ("PJM") will modify its contract with the Company if it does not meet PJM's set in-service date of June 1, 2027. (*Id.* ¶¶ 10-11.) Mr. Ballard bases this opinion on his witnessing "numerous transmission line projects fail," but he does not identify any of those "numerous" examples. (*Id.* ¶ 10.) Mr. Ballard continues to testify, without any supporting sources or methodology, that it is "questionable" whether the Company will suffer financial harm as a result of a construction delay. (*Id.* ¶ 12.) But an expert opinion is only relevant if it is "sufficiently tied to the facts of the case that it will aid [the trier of fact] in resolving a factual dispute." *Brasko v. First Nat'l Bank of Pennsylvania*, 700 F. Supp. 3d 354, 365 (D. Md. 2023) (quotations omitted). And "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *St. Michael's Media, Inc. v. Mayor and City Council of Baltimore*, 566 F.Supp.3d 327, 356 (2021) (citing *Gen. Elec. Co. v Joiner*, 522 U.S. 136, 146 (1997). It is within the Court's discretion to disregard proffered expert testimony in the context of a preliminary injunction, *see id.*, and the Court should exercise that discretion here. Because Mr. Ballard's opinions are untethered to his professional experience and lack any discernible supporting methodology, they are "little more than *ipse dixit*" and should be disregarded. *See id.*

Company's right to non-invasive survey access, and thus, the irreparable harm that will befall the Company if the preliminary injunction is not granted. As explained in the Company's Motion, after a CPCN application is filed, the PSC establishes a procedural schedule that sets deadlines for, among other things, the filing of written testimony from the parties and an evidentiary hearing to address that testimony. *See* COMAR 20.79.02.03. To date, the PSC has rejected the Company's request to enter a procedural schedule that would permit consideration of the Company's application to move forward without the PPRP-required survey data. *See* Supplemental Declaration of Dawn Shilkoski ("Shilkoski Supp. Decl.") ¶ 5.

On June 26, 2025, the PSC directed Staff to meet and confer with the Company and PPRP regarding the procedural schedule and submit a proposed schedule by July 28, 2025. *See id*. The Company conferred in good faith with Staff and PPRP as directed. *Id*. ¶ 6. During these conferences, however, PPRP reiterated that its required surveys were necessary for PPRP to evaluate the environmental and socioeconomic impacts of the proposed routes for the MPRP, echoing its assertion to the PSC in a prior filing that it would be "ill-advised to set a procedural schedule in this case at this time unless the dates established in the schedule provide a set amount of time *after* [the Company] provides all the Project data needed." *Id*. ¶ 7 & Ex. 15.

The Company, Staff, and PPRP were thus unable to agree, and on July 28, 2025, Staff submitted a proposed procedural schedule in accordance with the PSC's June 26, 2025 order. *Id*. ¶ 9. This proposed procedural schedule sets March 2, 2026 as the deadline for the Company to update its CPCN application with PPRP-required survey data. *Id*. ¶ 10 & Ex. 16. Only after the survey data is filed, Staff's proposed schedule then allows for the remainder of the process to play out, including to final resolution on the application. *Id*.

Most importantly, Staff's proposal makes the completion of the PPRP-required surveys the linchpin to advancing the CPCN review process at all: "Staff notes that the schedule i*s contingent upon* the Applicant being able to meet its expectations with regard to when it is able to provide PPRP with the required site surveys and analyses." *Id.* at Ex. 16 (emphasis added). Therefore, unless the Company is able to complete the field surveys by this deadline, the CPCN application is stymied under Staff's proposal. Absent preliminary relief, the Company will be unable to complete the PPRP-required surveys and analysis by March 2026 due to (1) the high volume of properties to be surveyed (317 in total), (2) the fact that each property requires multiple surveys, and (3) surveyor and supporting staff constraints. *Id.* ¶ 13.

In sum, Respondents cannot (and do not attempt to) rebut the fact that the Company will be stuck in an irreparable and impossible position if it is denied access to the properties to conduct the environmental surveys that PPRP has required. Permanent entrenchment in that purgatory state is the untenable but certain result of Respondents' argument against a preliminary injunction here, regardless of whether PJM's required in-service date remains in place or the Commission adopts Staff's proposed procedural schedule.

### B. The Company Will Suffer Monetary Harm Absent Preliminary Relief, Consistent with *Mountain Valley* and *Sage*.

Respondents argue that the Company has not shown that it will suffer irreparable monetary harm without preliminary relief. In so arguing, they functionally ask the Court, once again, to reverse its earlier decision in *Arentz Family*. But, just as in *Arentz Family*, the Company has demonstrated that it will suffer significant monetary harm without a preliminary injunction, in line with the well-settled precedent set forth in *Mountain Valley* and *Sage*.

As a threshold matter, Respondents argue that *Mountain Valley* and *Sage* are not persuasive authority because they are factually distinguishable—namely, because the energy providers in

those cases had already obtained CPCNs and those cases dealt with immediate land possession, not temporary rights of entry. ECF 144-1 at 15-16. But this Court has already dismissed such factual distinctions as irrelevant to the analysis of irreparable harm. *Arentz Family*, 2025 WL 1725814 at *21-*22. In other words, the facts that the Company has not yet obtained a CPCN and seeks only a temporary right of entry have no bearing on the monetary harm the Company will suffer if preliminary relief is not granted. Once again, Respondents fail to explain how the Company's lack of CPCN or its requested scope of property access somehow nullifies the monetary harm the Company has shown it will suffer.

Ignoring *Sage* and *Mountain Valley*, Respondents next argue that this is not a "rare" case in which monetary damage can qualify as irreparable harm because there is no guarantee the Company will obtain a CPCN. ECF 144-1 at 17, 23. But, as the Court held in *Arentz Family*, "the component of the irreparable harm in those cases [*Sage* and *Mountain Valley*] applies squarely here." *Arentz Family*, 2025 WL 1725814 at *22. Respondents argue that the Court's earlier conclusion is wrong for three reasons, but none of these reasons hold water.

First, Respondents argue that because the Company is not guaranteed to obtain a CPCN, it is not guaranteed to receive revenue from the MPRP, and so the possibility of monetary harm is "remote" and "speculative." ECF 144-1 at 23-24. They contrast this case with *Mountain Valley* and *Sage*, where the energy providers "had a CPCN and thus a clear path to construct the natural gas line and generate revenue." *Id*. at 24. But this is not a relevant distinction, as this Court has already recognized. *Arentz Family*, 2025 WL 1725814 at *21-*22. *Mountain Valley* and *Sage* do not hold that possession of a CPCN is a prerequisite to establishing monetary harm, and the energy providers in *Mountain Valley* and *Sage* were not guaranteed to timely construct and place into service their pipelines (and, in turn, generate revenue) simply because they had obtained a CPCN.

Respondents' insistence that the Company must be farther along in the CPCN process to establish a likelihood of monetary harm simply has no foothold in *Mountain Valley* or *Sage*.

Second, Respondents argue that the Company has failed to provide sufficient evidence of the monetary harms it will suffer absent preliminary relief, arguing that the projections set forth in the Declaration of Dawn Shilkoski (ECF 3) are "conclusory" and "inherently speculative." ECF 144-1 at 24. But this Court has already found that similar allegations of monetary harm were sufficient to establish irreparable harm. *Arentz Family*, 2025 WL 1725814 at *22 (citing ECF No. 75-1 at 29-30). *Coastland Corp. v. Third Nat. Mortg. Co.*, 611 F.2d 969 (4th Cir. 1979), does not otherwise lend Respondents any support, as there was no motion for preliminary injunction at issue and thus no analysis of whether lost revenue constitutes irreparable harm.

Third, and finally, the FERC Order attached to Respondents' brief (ECF 144-2) does not change the fact that the Company will suffer monetary harm absent preliminary relief.[3] The FERC Order granted the Company's request for the Abandoned Plant Incentive with respect to the MPRP. *PSEG Renewable Transmission LLC*, Order Granting Petition for Declaratory Order, 188 FERC ¶ 61,142, at P 16 (2024). The Abandoned Plant Incentive, which serves to promote transmission development, allows the Company to seek recovery of 100% prudently incurred costs expended on or after August 29, 2024, consistent with FERC precedent, if the MPRP is abandoned

---

[3] The Court should disregard the Declaration of Scott Molony (ECF 144-7) for the same reasons it should disregard Mr. Ballard's declaration. *See supra* n.2. Mr. Molony does nothing more than interpret the words of the FERC Order. This is an improper legal opinion. The interpretation of an agency opinion is a squarely legal matter on which an expert witness cannot opine. *See FDIC v. Bank of Am., N.A.*, 2024 WL 1076741, at *5 (D.D.C. Mar. 8, 2024) (an expert's interpretation of an agency rule or order is a "legal opinion squarely within the court's domain"); *United States v. Moriello*, 980 F.3d 924, 934 (4th Cir. 2020) ("regulatory interpretation is a question of law."); *Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, 845 F.3d 133, 138-39 (4th Cir. 2017) (interpretation of a National Pollution Discharge Elimination System license is a legal question). It is thus improper and unhelpful for a proffered expert to explain to the Court what FERC has issued in an order. Mr. Molony's declaration also suffers from other deficiencies, as he does not explain how his employment at FERC in accounting-related roles qualifies him to opine on incentives offered by FERC to transmission developers. He also does not disclose that he has successfully petitioned to intervene in the pending PSC proceeding on the Company's CPCN application as an owner of property adjacent to the proposed MPRP route, which he claims will "defile" his property. *See* **Exhibit 1**. Mr. Molony thus has a clear bias against the Company for which his declaration fails to account.

9

for reasons outside of the Company's control.  *Id.*  at P 17.  However, the Company's potential recovery for costs prudently incurred before August 29, 2024 is limited to 50%.  *Id.* at P 17, n.32.

As a result, if the MPRP cannot move forward, the Company is guaranteed to lose 50% of costs it incurred prior to August 29, 2024.  The loss of these costs constitutes irreparable harm, and it does not matter that the costs have already been incurred.  *See Columbia Gas Transmission, LLC v. 84.53 Acres of Land*, 310 F. Supp. 3d 685, 692-93 (N.D. W.Va. 2018) (holding that projected losses stemming from contracts entered into by pipeline developer before CPCN issued were sufficient to show irreparable harm for preliminary injunction).   Most critically, however, the Abandoned Plant Incentive in the FERC Order does not allow the Company to recover lost revenues it would have otherwise obtained had the MPRP been placed in service.  Accordingly, the FERC Order has no effect on the monetary harm that the Company will suffer in the absence of preliminary relief.

### C.  The Company Is Irreparably Harmed So Long As It Cannot Exercise Its Rights Under RP § 12-111.

Finally, so long as the Company is blocked from exercising its statutory right to enter Respondents' properties to conduct the surveys required by PPRP, the Company will be irreparably harmed, full stop.  Respondents do not meaningfully challenge this conclusion.  They attempt to fashion a three-part test for determining when the denial of a statutory entitlement constitutes irreparable injury.  *See* ECF 144-1 at 26 (arguing the right must be (1) clearly conferred, (2) the deprivation must cause lasting and significant economic consequences; and (3) the right must be fleeting).  But Respondents' cited cases do not follow this test.  *See Heritage Found. v. U.S. Dept. of State*, 2024 WL 4607501, at *5 (D.D.C. Oct. 29, 2024) (recognizing irreparable harm can exist in the context of slow responses to FOIA requests, even though there are no "lasting and significant economic consequences" to the deprivation of an entitlement to

swift disclosure); *Planned Parenthood S. Atl. v. Baker*, 326 F. Supp. 3d 39, 45, 48-49 (D.S.C. 2018), *aff'd*, 941 F.3d 687 (4th Cir. 2019) (recognizing that the denial of a statutory right to choose one's medical provider constitutes irreparable harm, even though there was no discussion of a lasting economic injury).

Rather, deprivations of statutory entitlements are evaluated on a case-by-case basis, given the various contexts in which such deprivations arise. Thus, cases in the context of a statutory right of entry are most instructive. The most analogous case is *Continental Resources, Inc. v. Langved*, 2015 WL 686965 (D.N.D. Feb. 18, 2015). There, the court granted a motion for preliminary injunction to Continental, who had acquired rights to drill a property but faced landowner interference. North Dakota law required Continental to provide notice to the landowner before entering his property to begin construction work, and it did so. *Id*. at *2; *see also* N.D.C.C. 38.11.1-04.1(2). As a result, after providing the required notice, Continental had a statutory right to enter Langved's property. *Id*. at *2-*3. The court found that Continental was likely to suffer irreparable harm absent preliminary relief due to the continuing deprivation of its statutory (in addition to contractual) rights. *Id*. at *5 ("If Langved is allowed to prevent Continental from continuing its drilling operations on the Subject Property, even temporarily, Langved will wrongfully strip Continental of its contractual and statutory rights.").

Just as Continental satisfied the requirements of North Dakota law that entitled it to enter Langved's property, the Company has satisfied the elements of RP § 12-111(a) that entitle it to enter Respondents' properties. But, just as Langved interfered with Continental's statutory right of entry, Respondents now interfere with the Company's statutory right to do the same. Like Continental, the Company's loss of its statutory right is not compensable in a future proceeding. And, like Continental, the Company has no way to recapture its statutory right to

11

enter Respondents' properties absent relief from this Court.  Indeed, the case for irreparable injury is even stronger here than in *Continental Resources*, as RP § 12-111(b) limits the Company's remedy to "an order directing that the person be permitted to enter," while the North Dakota statute at issue in *Continental Resources* contained no such limiting provision.  *See* N.D.C.C. 38.11.1-04.1(2).  As a result, Respondents' continued obstruction of the Company's statutory entitlement to enter their properties is direct and unequivocal irreparable harm to warrant a preliminary injunction.

### IV. The Balance of Equities Weighs in the Company's Favor.

In contrast to the direct and irreparable harm that the Company will suffer if it is unable to obtain temporary access to Respondents' properties, Respondents have not alleged any cognizable injury or prejudicial impact that would result from granting a preliminary injunction that enforces the Company's right of temporary, non-invasive survey access.

These concerns are speculative at best, as the few Respondents who have submitted declarations themselves concede.  ECF 144-8 ¶ 21 ("Indefinite access to this sensitive farmland *could* result in biosecurity breaches"), ¶ 22 ("I am also concerned that having strangers on the properties *could* result in our livestock escaping their pastures and being harmed or even killed."), ¶ 23 ("Indefinite access to the Properties *could* result in physical damage to fields, pastures, and fencing."); ECF 144-9 ¶ 19 ("Indefinite access to the Property *could* result in physical damage to fields, fencing, irrigation systems, or conservation practices."); ¶ 21 ("[S]trangers walking around unsupervised on the Property *may* come into contact with these crop-protection products, which may pose certain risks to those strangers."); ECF 144-10 ¶ 17 ("Indefinite access to the Property *could* result in physical damage to the trees, streams, underground springs and wetlands that my family enjoys."); ECF 144-11 ¶ 22 ("Indefinite access to the Property *could* result in physical

damage to the trees, pond, streams, and underground springs that my family and customers enjoy.").  While these Respondents express concerns about "strangers" on their properties for various reasons (*see* ECF 144-8 ¶ 22; ECF 144-9 ¶ 20; ECF 144-10 ¶ 16; ECF 144-11 ¶ 21), they do not identify any actual concern with the Company's surveyors or other agents, nor do they identify any possible harm that might (let alone will) result from these concerns.

Even if any of these speculative harms did come to pass, Respondents have a mechanism within RP § 12-111(c) to seek recovery for any damages caused by the Company or its agents in the course of performing PPRP's requested surveys.  On nearly identical facts, this Court has held that "the balance of equities tips in [the Company's] favor" because "(1) the studies [the Company] seeks to conduct would be minimally invasive, (2) [the Company] only seeks a temporary right of entry (not permanent), and (3) Respondents may file a cause of action for damages in the event that any land or personal property is damaged or destroyed as a result of the surveys[.]"  *Arentz Family*, 2025 WL 1725814, at *22.  Respondents offer no compelling reason for the Court to reach a different result here.

Similarly, this Court has already rejected Respondents' argument that the temporary access the Company seeks constitutes a taking.  Respondents look to *Cedar Point Nursey v. Hassid*, 594 U.S. 139 (2021) to argue that the Company's requested temporary access is a "*per se* physical taking."  ECF 144-1 at 31.  But, as this Court recognized in *Arentz Family*, "the right of entry that [the Company] seeks here, and to which [RP] § 12-111 entitles it, comes nowhere close to the frequent, extended physical presence at issue in *Cedar Point*—especially because [RP] § 12-111 itself requires that if [the Company] 'damages or destroys any land or personal property,' it must pay the property owner to repair the damage."  *Arentz Family*, 2025 WL 1725814, at *20 (citing RP § 12-111(c)).

13

Respondents cobble together various other authorities to insist that a preliminary injunction would cloud title to their properties, which they argue is a harm that tips the scale of harms in their favor.  ECF 144-1 at 32-34.  But none of Respondents' cited authorities applying Maryland law actually say this.  For example, in *J.L. Matthews, Inc. v. Maryland-National Capital Park and Planning Commission*, 368 Md. 71 (2002), the Supreme Court of Maryland analyzed the standard for the issuance of a temporary restraining order and/or a preliminary injunction in the context of a condemnation proceeding—which this is not—and there was no allegation that the condemning agency had clouded plaintiff's title.  Their other cases, *Reichs Ford Road Joint Venture v. State Roads Commission of the State Highway Administration*, 388 Md. 500 (2005), and *Litz v. Maryland Department of the Environment*, 446 Md. 254 (2016), pertain to the types of damages recoverable in an inverse condemnation proceeding—which, again, this is not.

In sum, Respondents' proffered harms are speculative, at best.  This Court has already correctly rejected Respondents' assertion that the Company's requested access constitutes a taking, and there is no basis in law to support Respondents' claim that a preliminary injunction would cloud title to their properties.  None of these specious harms outweighs the significant harms to the Company that will result if preliminary relief is denied, as discussed above.

## V.  The Public Interest Favors An Injunction.

The Company has shown definitively that the Court's affirmance of its temporary, non-invasive access rights under RP § 12-111 is in the public interest.[4]  In contrast, Respondents advance no independent basis to show that the preliminary injunction sought here contravenes the public interest.  The public interest in granting the Company its right to access Respondents'

---

[4] As the Company's Petition explains, PJM—which oversees a region of thirteen states and the District of Columbia, and which acts pursuant to authority conferred upon it by FERC—has identified significant risks to the region's electric grid.  (ECF 1 ¶¶ 412-13).  If these risks are not addressed, overall system reliability for customers throughout PJM's region—not just in Maryland—could be compromised.  (*Id.* ¶ 414.)

properties to conduct surveys is demonstrated by the fact that *every* State agency, *every* County government, and *every* environmental group who has spoken on the topic in the Company's pending CPCN proceeding has said that the requested surveys are instrumental to identifying, understanding, and mitigating the environmental impacts of the MPRP. *See* ECF 124-2; ECF 124-3; ECF 124-4; Shilkoski Supp. Decl. ¶ 7 & Exs. 15, 16.

As this Court recognized in *Arentz Family*, "advancing projects like this one [the MPRP] is generally in the public interest." 2025 WL 1725814, at *23 (citing *Mountain Valley*, 915 F.3d at 221-222; *Sage*, 361 F.3d at 830). This Court also correctly observed that there was "no reason to second guess" the determination of PPRP—the state agency "tasked with assessing environmental and socioeconomic effects of properties like this one"—"that conducting these studies would be in the public interest." *Id*. (citing NR § 3-303). Respondents offer no legitimate basis for the Court to depart from this well-reasoned conclusion in this instance.

## CONCLUSION

For the foregoing reasons, the Company respectfully asks this Court to enter a preliminary injunction that permits the Company to enter Respondents' properties to conduct the surveys and gather the information required by PPRP. Pursuant to Federal Rule of Civil Procedure 65(a)(2), the Company respectfully requests that the Court advance trial on the merits of the Company's Petition and consolidate it with a hearing on the Company's motion.

Date: August 8, 2025

Respectfully submitted,

*/s/ Kurt J. Fischer*
Kurt J. Fischer (Bar No. 03300)
Venable LLP
210 W. Pennsylvania Avenue
Suite 500
Towson, MD 21204
(410) 494-6200
kjfischer@venable.com

J. Joseph Curran III (Bar No. 22710)
Christopher S. Gunderson (Bar No. 27323)
Kenneth L. Thompson (Bar No. 03630)
Susan R. Schipper (Bar No. 19640)
Emily J. Wilson (Bar No. 20780)
Venable LLP
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
(410) 244-7400
jcurran@venable.com
csgunderson@venable.com
csgunderson@venable.com
srschipper@venable.com
ejwilson@venable.com

*Attorneys for Petitioner PSEG*
*Renewable Transmission LLC*

16

**CERTIFICATE OF SERVICE**

I hereby certify on this 8th day of August, 2025, I electronically filed and served the foregoing on all counsel of record using the Court's CM/ECF system.

*/s/ Emily J. Wilson*
Emily J. Wilson